**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**June 23, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

_____

WICHITA AND AFFILIATED TRIBES,

    Plaintiff - Appellant,

v.

J. KEVIN STITT, in his official capacity as
the Governor of the State of Oklahoma,

    Defendant - Appellee.

No. 23-6041
(D.C. No. 5:19-CV-01198-D)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, Chief Judge, **EBEL**, and **ROSSMAN**, Circuit Judges.
_____

The Wichita and Affiliated Tribes ("the Tribe") appeals from the district court's

grant of summary judgment for Oklahoma Governor Kevin Stitt ("the Governor") on the

Tribe's claims alleging that he violated the terms of the 2006 Wichita-Oklahoma gaming

compact ("the Compact") by infringing the Tribe's exclusive right to conduct certain

gaming within the State of Oklahoma ("Oklahoma" or "the State").

The Tribe alleges that the Governor violated two parts of the Compact, Part 11.A

and Part 11.E, through three changes in Oklahoma law: specifically, changes that had the

---

[*]    This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R.
32.1.

effect of (1) repealing an Oklahoma state constitutional provision that prohibited liquor stores from selling lottery tickets, (2) expanding the hours during which racetracks permissibly can operate certain games, and (3) authorizing second-chance and promotional lotteries by the Oklahoma state lottery through a web-based application. Based on these alleged violations, the Tribe seeks a declaratory judgment that the Tribe is entitled to liquidated damages under the Compact and a declaratory judgment that the Tribe is excused from paying the exclusivity fees that Part 11.A of the Compact requires.

The district court granted summary judgment to the Governor. It concluded that the Tribe's request for a declaratory judgment that the Tribe is entitled to liquidated damages is barred by the State's Eleventh Amendment immunity. And it rejected the Tribe's other claim for declaratory relief on the ground that the three complained-of changes in Oklahoma law did not violate the Compact's unambiguous terms.

Exercising jurisdiction under 28 U.S.C. § 1291, we uphold the district court's sovereign-immunity, jurisdictional dismissal of the Tribe's claim for a declaratory judgment that the Tribe was entitled to liquidated damages. We also conclude that the district court did properly exercise jurisdiction over the Tribe's other claim for a declaratory judgment—specifically, the Tribe's claim for a declaration that it was excused from paying the exclusivity fees that Part 11.A of the Compact requires. However, on the merits of that exclusivity-fees claim, we hold that Part 11.A of the Compact is ambiguous, and the district court erred in deciding to the contrary; therefore, the district court's decision in favor of the Governor—predicated on the court's view that the Compact is not ambiguous—cannot stand.

In sum, we **affirm** the district court's sovereign-immunity, jurisdictional dismissal of the Tribe's claim for a declaratory judgment that it is entitled to liquidated damages. And we **reverse** the district court's adverse summary judgment ruling on the Tribe's claim for a declaratory judgment that the Tribe is excused from paying the exclusivity fees that Part 11.A of the Compact requires and **remand** to the district court with directions to vacate its judgment dismissing that claim and resolve Part 11.A's ambiguity and conduct all necessary further proceedings.

**I**

We begin by detailing the operative legal regime at the federal and state levels as well as the facts giving rise to this dispute.

**A**

In 1988, Congress enacted the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721, "to create a framework for states and Indian tribes to cooperate in regulating on-reservation tribal gaming." *Navajo Nation v. Dalley*, 896 F.3d 1196, 1201 (10th Cir. 2018). IGRA divides gaming into three classes. *See* 25 U.S.C. § 2703(6)–(8). Class I gaming, the only class not regulated by IGRA, is defined as "social games solely for prizes of minimal value or traditional forms of Indian gaming." *Id.* § 2703(6). Class II gaming is defined as bingo and certain card games. *See id.* § 2703(7). And Class III gaming—at issue in this case—is defined as "all forms of gaming that are not class I gaming or class II gaming." *Id.* § 2703(8).

Class III gaming "includes the most lucrative forms of gaming," *New Mexico v. Dep't of Interior ("N.M./DOI")*, 854 F.3d 1207, 1212 (10th Cir. 2017), such as "slot

3

machines, casino games, banking card games, dog racing, and lotteries," *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 48 (1996).  It is also the "most closely regulated" type of gaming.  *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 785 (2014); *see also Comanche Nation v. Ware*, 174 F.4th 717, 728 (10th Cir. 2026) (noting that "IGRA regulates class III most heavily and imposes an extensive framework for allocating authority between the states and tribes").

Class III gaming can only be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect."  25 U.S.C. § 2710(d)(1)(C); *see also Bay Mills*, 572 U.S. at 785 ("A tribe may conduct [Class III] gaming on Indian lands only pursuant to, and in compliance with, a compact it has negotiated with the surrounding State."); *Navajo Nation*, 896 F.3d at 1201 ("[A]bsent [tribal-State] compacts, the most 'lucrative' form of gaming—Class III gaming—is forbidden." (quoting *N.M./DOI*, 854 F.3d at 1212)).  "A compact typically prescribes rules for operating gaming, allocates law enforcement authority between the tribe and State, and provides remedies for breach of the agreement's terms."  *Bay Mills*, 572 U.S. at 785.  Tribal-State gaming compacts must be approved by the United States Department of the Interior.  25 U.S.C. § 2710(d)(3)(B), (d)(8).

**B**

In 2004, Oklahoma passed the State-Tribal Gaming Act ("STGA"), 2004 Okla. Sess. Laws Ch. 316 (codified as amended at OKLA. STAT. tit. 3A, §§ 261–282).  The STGA "sets forth the terms and conditions under which the State's federally recognized Tribes can engage in Class III gaming on tribal land through compacts."  *Treat v. Stitt*

4

("*Treat I*"), 481 P.3d 240, 242 (Okla. 2021). To that end, it makes an "offer of a model tribal gaming compact regarding gaming to all federally recognized Indian tribes . . . which, if accepted, [would] constitute a gaming compact between th[e] [S]tate and the accepting tribe for purposes of the Indian Gaming Regulatory Act." OKLA. STAT. tit. 3A, § 280; *see also Treat I*, 481 P.3d at 242 ("The citizens of Oklahoma approved a specific statutory process by which the State enters into Model Compacts with Indian Tribes within Oklahoma.").

The STGA also contemplates some nontribal entities engaging in Class III gaming. It states that, "[i]f at least four Indian tribes enter into the model tribal-state compact . . . and such compacts are approved by the Secretary of the Interior . . . , the Oklahoma Horse Racing Commission [] shall license organization licensees . . . to conduct authorized gaming." OKLA. STAT. tit. 3A, § 262(A). This "authorized gaming" includes, *inter alia*, electronic amusement games, electronic bonanza-style bingo games, and electronic instant bingo games. *See id.* §§ 262(C)(2), 269(1). The STGA limits, however, the number of organization licensees who will be permitted to conduct authorized gaming and the number of player-terminals those organization licensees can operate. *See id.* § 262(C).

C

The Wichita and Affiliated Tribes operate as a single federally recognized Indian tribe. After the enactment of the STGA, a number of federally recognized tribes—including the Tribe—entered into compacts with the State along the lines of the model compact that the STGA provided.

5

The Compact between the Tribe and the State is the subject of this appeal. The Tribe and the State entered into the Compact "with respect to the operation of covered games . . . on the Tribe's Indian lands as defined by the Indian Gaming Regulatory Act." Aplt.'s App., Vol. I, at 133 (Compact, filed Feb. 14, 2020). The Compact defines "covered games":

> "Covered game" means the following games conducted in accordance with the standards, as applicable, set forth in Sections 11 through 18 of the State-Tribal Gaming Act: an electronic bonanza-style bingo game, an electronic amusement game, an electronic instant bingo game, nonhouse-banked card games; any other game, if the operation of such game by a tribe would require a compact and if such game has been: (i) approved by the Oklahoma Horse Racing Commission for use by an organization licensee, (ii) approved by state legislation for use by any person or entity, or (iii) approved by amendment of the State-Tribal Gaming Act.

Id. at 134. The Compact also defines "[e]lectronic amusement game," "[e]lectronic bonanza-style bingo game," and "[e]lectronic instant bingo game" in a manner consistent with the definitions of those terms in the STGA. See id. at 134–35; cf. OKLA. STAT. tit. 3A, §§ 269.5–269.7. The STGA defines other terms used in the Compact as well; however, notably, those STGA definitions do not automatically apply to the Compact. In particular, by its plain terms, the STGA's definitions do not apply to the section of the STGA that codifies the model compact. Compare OKLA. STAT. tit. 3A, § 269 (limiting STGA's definitions to "Sections 2 through 20 of this act"), with 2004 Okla. Sess. Laws Ch. 316 (codifying model compact at section 22 of STGA).

This appeal focuses on Parts 11.A and 11.E of the Compact, although other provisions remain relevant. Part 11 is entitled "Exclusivity and Fees." Aplt.'s App.,

6

Vol. I, at 150 (some capitalization omitted). Part 11.A sets forth the Tribe's entitlement

to "substantial exclusivity" and its corresponding obligation to pay exclusivity fees:

> The parties acknowledge and recognize that this Compact provides
> tribes with substantial exclusivity and, consistent with the goals of
> IGRA, special opportunities for tribal economic opportunity through
> gaming within the external boundaries of Oklahoma in respect to the
> covered games. In consideration thereof, so long as the state does not
> change its laws after the effective date of this Compact to permit the
> operation of any additional form of gaming by any such organization
> licensee, or change its laws to permit *any additional electronic or
> machine gaming* within Oklahoma, the tribe agrees to pay the
> following fees . . . . *to the Treasurer of the State of Oklahoma*.

*Id.* at 150–51 (emphases added).

Part 11.E of the Compact sets forth the State's obligation to pay liquidated

damages if the Tribe's substantial exclusivity is violated:

> In consideration for the covenants and agreements contained herein,
> the state agrees that it will not, during the term of this Compact, permit
> the nontribal operation of any machines or devices to play covered
> games or electronic or mechanical gaming devices otherwise
> presently prohibited by law within the state in excess of the number
> and outside of the designated locations authorized by the State-Tribal
> Gaming Act. The state recognizes the importance of this provision to
> the tribe and agrees, in the event of a breach of this provision by the
> state, to require any nontribal entity which operates any such devices
> or machines in excess of such number or outside of the designated
> location to remit to the state at least quarterly no less than fifty percent
> (50%) of any increase in the entities' adjusted gross revenues
> following the addition of such excess machines. The state further
> agrees to remit at least quarterly to eligible tribes, as liquidated
> damages, a sum equal to fifty percent (50%) of any increase in the
> entities' adjusted gross revenues following the addition of such excess
> machines.

*Id.* at 151.

**D**

The gravamen of the Tribe's claims is that three changes in Oklahoma state law have violated its substantial exclusivity under Parts 11.A and 11.E.

In 2016, Oklahoma voters approved S.Q. 792 (liquor-store lottery-ticket sales)[1]. *See Inst. for Responsible Alcohol Pol'y v. State ex rel. Alcoholic Beverage L. Enf't Comm'n*, 457 P.3d 1050, 1052–53 (Okla. 2020). It repealed Article 28 of the Oklahoma Constitution and replaced it with Article 28A. *See id.* Article 28 limited liquor stores to the sale of liquor. OKLA. CONST. art. XXVIII, § 4, *repealed by* 2016 Okla. Sess. Laws Sen. Jt. Res. 68, State Question No. 792, Legislative Referendum No. 370, adopted at Nov. 8, 2016, election. Article 28A, by contrast, permits liquor stores "to sell at retail any item that may be purchased at a grocery store or convenience store." *Id.* art. XXVIII-A, § 3(A)(1). The Tribe complains that liquor stores have since been permitted to sell lottery tickets.

In 2017, the Oklahoma legislature passed H.B. 1836 (expanded racetrack gaming hours). 2017 Okla. Sess. Laws Ch. 115 (amending OKLA. STAT. tit. 3A, § 262 (2017)). It amended the STGA to remove a limitation on when organization licensees could engage in authorized gaming: Specifically, under that limitation, authorized gaming could not be conducted for more than 106 hours per week, with no more than eighteen hours in any twenty-four-hour period. *See id.*

---

[1]    Throughout this order and judgment, when referring to any of the various legislative actions at issue in this appeal, we may employ parentheticals as descriptive aids for the reader's recollection of that legislative action's substance, unless the substance is already apparent from the surrounding context.

And in 2018, the Oklahoma legislature passed H.B. 3538 (online lottery). 2018 Okla. Sess. Laws Ch. 125 (codified at OKLA. STAT. tit. 3A, § 724.5). It permits lottery players to submit entries for "lottery-sponsored promotions and second-chance drawing promotions" via "a web application provided or sponsored by the [Oklahoma Lottery] Commission." OKLA. STAT. tit. 3A, § 724.5(A).

## E

This appeal involves an offshoot of the high-profile *Cherokee Nation* litigation in the Western District of Oklahoma. *See generally Cherokee Nation v. Stitt*, 475 F. Supp. 3d 1277 (W.D. Okla. 2020). In that litigation, several Indian tribes that had entered into gaming compacts with the State—including the Tribe as intervenor—sued the Governor for a declaratory judgment that the State, having permitted organization licensees to engage in electronic gaming, had triggered automatic renewal of the compacts on their January 1, 2020, expiration dates. The district court granted summary judgment in the tribes' favor, concluding that the Oklahoma Horse Racing Commission had authorized organization licensees to conduct electronic gaming, and that "[n]o more was required for the Compacts to automatically renew." Aplt.'s App., Vol. VII, at 1209 (Dist. Ct. Order on Renewal, filed July 28, 2020).

Thereafter, the Tribe and the Governor notified the district court that there remained for decision both Count XIII of the Tribe's First Amended Complaint in Intervention[2] and the Governor's related counterclaim against the Tribe. Count XIII

---

[2]     Count XIV also remained for decision. But the district court deemed that claim abandoned, and the Tribe has not challenged that determination on appeal.

alleged that the Governor violated the exclusivity provisions of the Compact "by permitting the operation of additional forms of gaming and changing its laws to permit additional electronic gaming, for example, by the passage of HB 3538 [(online lottery)]." Aplt.'s App., Vol. II, ¶ 203, at 282–83 (First Am. Compl. in Intervention, filed Mar. 17, 2020).

The Tribe sought two types of declaratory relief[3]: (1) a declaratory judgment "that the Wichita Tribe is entitled to damages from the State pursuant to Part 11.E of the Compact during the period of violation," and (2) a declaratory judgment that the State had violated Part 11.A of the Compact, such that the Tribe was excused from paying exclusivity fees to the State. *Id.* ¶ 205, at 283–84; *id.* at 286. And the Governor asserted counterclaims against the Tribe for non-payment of exclusivity fees.

The district court entered a final declaratory judgment in favor of the tribes with respect to the renewal issue and excluded from that judgment "Count[] XIII [] [] of the First Amended Complaint" and "Defendant's counterclaim that the Wichita and Affiliated Tribes 'breached the Wichita Gaming Compact . . . by failing to remit all substantial exclusivity fees owed to the State pursuant to Part 11.A of the Wichita

---

        3       The Tribe also sought a permanent injunction prohibiting the State from continuing to violate Part 11.A of the Compact, but that claim for relief is not properly before us on appeal; the Tribe has made no attempt to challenge the district court's dismissal of that claim, so we deem it to be abandoned. *See Scarlett v. Air Methods Corp.*, 922 F.3d 1053, 1067 (10th Cir. 2019) (deeming claim not discussed in appellate briefing abandoned); *accord Purgatory Recreation I, LLC v. United States*, 157 F.4th 1173, 1188 n.12 (10th Cir. 2025).

Gaming Compact.'" Aplt.'s App., Vol. VII, at 1263 (Final J., filed Sept. 23, 2020) (omission in original).[4]

The Governor then moved for summary judgment on Count XIII. He argued that the Tribe's claim for a declaratory judgment that it is entitled to liquidated damages was barred by the State's Eleventh Amendment immunity. He also argued that, in his official capacity as Governor, he was "not the proper party" because "the administration or enforcement of the state lottery is not within the duties of the Governor."[5] *Id.* at 1296 (Def.'s Mot. for Summ. J., filed Oct. 29, 2021). And on the merits, he argued that H.B. 3538, which permitted internet-based lottery activities, did not infringe on the Tribe's substantial exclusivity—and therefore did not relieve the Tribe of its duty to pay exclusivity fees or entitle the Tribe to liquidated damages—because, *inter alia*, it did not qualify as an electronic game under the Compact.

The Tribe also moved for summary judgment. It argued that it was excused from its obligation to pay exclusivity fees because the State had allowed additional electronic or machine gaming within the state—and therefore violated the Tribe's substantial exclusivity protected by Part 11.A of the Compact—by allowing the law to be changed in three ways: (1) through S.Q. 792, authorizing the sale of lottery tickets at liquor stores; (2) through H.B. 1836, expanding the hours of operation of electronic games by

---

[4] No party has appealed the final judgment, so the renewal portion of the litigation has seemingly ended.

[5] The Governor clarified at oral argument that this is a challenge to the Tribe's Article III standing.

organization licensees; and (3) through H.B. 3538, authorizing the submission of second-chance and promotional lottery entries over the Internet, including on mobile phones.  And the Tribe argued that the same changes in law entitled it to liquidated damages under Part 11.E.[6]

The district court granted summary judgment in the Governor's favor.  First, the district court declined to reach the issue of whether the Governor was the proper party.  Next, the district court concluded that the Tribe's request for a declaratory judgment that it is entitled to liquidated damages was barred by the State's Eleventh Amendment immunity.  Finally, the district court rejected on the merits the Tribe's claim for declaratory relief regarding the exclusivity payments required by Part 11.A of the Compact.  More specifically, on the merits, the district court concluded that, by the Compact's unambiguous terms, the State had not violated the Tribe's substantial exclusivity.  It read Part 11.A's sweeping prohibition against "any additional electronic or

---

[6]     After the motions for summary judgment were filed, the Tribe moved to supplement the record to include additional evidence related to the operation of the Oklahoma Lottery Commission's mobile app.  The Tribe alleged that the new evidence showed an expansion of the allegedly infringing actions of the Oklahoma Lottery Commission because "that Commission has since updated its mobile application to allow players to participate in 'lottery sponsored promotions.'"  Aplt.'s App., Vol. IX, at 1515 (Mot. to Suppl., filed Dec. 29, 2022).  In the district court's summary-judgment decision, it found that the "Tribe's supplemental materials do not affect the resolution of the Motions [for Summary Judgment] and are unnecessary," and it ultimately denied the motion as moot.  *Id.* at 1547 n.3 (Order, filed Feb. 24, 2023).  On appeal, the Tribe mentions in passing (in a footnote) that the district court erred in denying its motion, but it raises no meaningful argument on this point.  We deem this challenge to be waived due to inadequate briefing.  *See United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019).

machine gaming" as limited by that part's narrow grant of substantial exclusivity "in respect to covered games." In particular, the court reasoned that the State had not violated Part 11.A, because S.Q. 792 (liquor-store lottery-ticket sales) and H.B. 3538 (online lottery) concerned the lottery, which is not a "covered game," and because H.B. 1836 (expanded racetrack gaming hours) changed the hours of operation, which is not permitting an additional form of gaming.

After the Governor voluntarily dismissed his counterclaim against the Tribe, the district court entered final judgment on the Tribe's remaining claims. This appeal timely followed.

## II

Having outlined the legal, factual, and procedural background, we are almost ready to turn to the merits. But first, we must address subject-matter jurisdiction. *See Comanche Nation*, 174 F.4th at 725 ("Before reaching the parties' arguments, we have an obligation to ensure our jurisdiction over the case before us."); *Rural Water Sewer & Solid Waste Mgmt., Dist. No. 1, Logan Cnty., Okla. v. City of Guthrie*, 654 F.3d 1058, 1068–69 (10th Cir. 2011) ("Ordinarily, this court must resolve jurisdictional issues, such as sovereign immunity and standing, 'before addressing the merits of the claim[] . . . .'" (quoting *Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1259 (10th Cir. 2009)); *see also Brownback v. King*, 592 U.S. 209, 218 (2021) ("Ordinarily, a court cannot issue a ruling on the merits 'when it has no jurisdiction' because 'to do so is, by very definition, for a court to act ultra vires.'" (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998))).

13

This appeal presents challenges to the district court's jurisdiction over each of the Tribe's two claims for relief. The Tribe contests the district court's conclusion that its claim for a declaratory judgment that it is entitled to liquidated damages is barred by the Eleventh Amendment. And the Governor challenges the Tribe's Article III standing to sue him for a declaratory judgment that the Tribe is excused from paying the exclusivity fees required by Part 11.A.

Our review is de novo. *See, e.g.*, *United States v. Gulley*, 130 F.4th 1178, 1183 (10th Cir. 2025) ("We review jurisdictional challenges de novo."). We address each challenge in turn.

## A

The Tribe challenges the district court's dismissal on Eleventh Amendment grounds of its claim for a declaratory judgment that it is entitled to liquidated damages. We reject this challenge.

Part 11.E of the Compact provides for liquidated damages under specified circumstances. Specifically, the State promised not to permit the nontribal operation of covered games or electronic or mechanical games in excess of what was already authorized by the STGA. And the State agreed, in the event of a breach of that promise, to remit "as liquidated damages[] a sum equal to fifty percent (50%) of any increase in the [infringing nontribal] entities' adjusted gross revenues following the [operation] of such excess [games]." Aplt.'s App., Vol. I, at 151.

In its operative pleading, the Tribe prayed for a declaratory judgment that the State breached Part 11.E and that the Tribe is therefore entitled to liquidated damages. At

14

summary judgment, the district court dismissed that claim for relief as barred by the State's Eleventh Amendment immunity.  On appeal, the Tribe argues that the district court erred because, under *Ex parte Young*, 209 U.S. 123 (1908), that claim for prospective declaratory relief against the Governor does not implicate the State's Eleventh Amendment immunity.[7]  We disagree.

Under the Eleventh Amendment, states are immune from suit in federal court, subject to limited exceptions.  *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253–54 (2011).  One prominent exception is the doctrine of *Ex parte Young*, under which Eleventh Amendment immunity does not extend to suits for prospective, declaratory or injunctive relief against state officers in their official capacities alleging an ongoing violation of federal law.  *See, e.g.*, *Reed v. Goertz*, 598 U.S. 230, 234 (2023).  However, *Ex parte Young* does not apply to official-capacity claims for relief that—even if equitable in form—are "tantamount to an award of damages for a past violation of federal

---

[7]     The Tribe also argues that the State has waived its Eleventh Amendment immunity by its litigation conduct.  But we deem that argument waived for failure to engage with the district court's rationale for rejecting it.  At summary judgment, the district court rejected the argument on the ground that, even if the State's litigation conduct waived its Eleventh Amendment immunity from suit, it did not waive its Eleventh Amendment immunity from liability for monetary damages.  *Cf. Trant v. Oklahoma*, 754 F.3d 1158, 1173 (10th Cir. 2014) ("[A] state may waive immunity from suit while retaining immunity from liability for monetary damages.").  On appeal, the Tribe has not engaged with that rationale.  Accordingly, any argument that the Tribe could have made contrary to this rationale is therefore waived.  *See Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015) ("The first task of an appellant is to explain to us why the district court's decision was wrong."); *Walker*, 918 F.3d at 1151 ("Ordinarily, a party's failure to address an issue in its opening brief results in that issue being deemed waived.  And, ordinarily, we will decline to reach the merits of waived issues.").

law." *Papasan v. Allain*, 478 U.S. 265, 278 (1986); *accord Edelman v. Jordan*, 415 U.S. 651, 665–66 (1974).  "[T]he question is whether the relief 'constitute[s] permissible prospective relief or a "retroactive award which requires the payment of funds from the state treasury."'"  *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 690 (1982) (second alteration in original) (quoting *Quern v. Jordan*, 440 U.S. 332, 346–47 (1979)).

Here, the Tribe's request for declaratory relief entitling it to liquidated damages is plainly barred by the Eleventh Amendment.  By its very terms, Part 11.E provides for monetary relief as compensation for a breach of the Compact's exclusivity provisions, which is a classic retroactive award from the State's treasury.  Aplt.'s App., Vol. I, at 151 ("The State . . . agrees, in the event of a breach of this provision by the state, . . . . to remit at least quarterly to eligible tribes[] [] liquidated damages . . . .").  And this part of the Compact refers to that compensation as "liquidated damages," *id.*, which, by definition, are retroactive, compensatory relief.  *See Liquidated Damages*, BLACK'S LAW DICTIONARY (8th ed. 2004) ("An amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches."); *see also Mills v. Maine*, 118 F.3d 37, 54 (1st Cir. 1997) (explaining that claim for liquidated damages is monetary relief to which *Ex parte Young* does not apply).

Accordingly, we affirm the district court's dismissal of the Tribe's claim for a declaratory judgment that it is entitled to liquidated damages as barred by the State's Eleventh Amendment immunity.[8]

---

[8]     Because we conclude that the Tribe's claim under Part 11.E of the Compact is barred by the State's Eleventh Amendment immunity, we do not reach the Governor's

**B**

The Governor also challenges the Tribe's Article III standing to sue him for a declaratory judgment that the Tribe is excused from paying the exclusivity fees that Part 11.A requires.  We reject this challenge as well.

"The judicial Power" of the United States is limited to "Cases" and "Controversies."  U.S. CONST. art. III, § 2, cl. 1; *accord Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 110 (2025).  "A proper case or controversy exists only when at least one plaintiff 'establish[es] that [it] ha[s] standing to sue.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (first and third alterations in original) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "To do so, [it] must show (1) it has an injury in fact to a legally protected right, (2) the claimed injury was caused by the actions of [the defendant], and (3) the relief requested from the district court will redress the injury." *United States v. Colo. & E. R.R. Co.*, 882 F.3d 1264, 1269 (10th Cir. 2018). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

The Tribe's remaining claim for relief is its request for a declaratory judgment that it is excused from paying the exclusivity fees required by Part 11.A.  It is undisputed that the State's alleged breach of Part 11.A of the Compact and the Tribe's alleged resultant

---

alternative argument that the Tribe has not proven it is an "eligible tribe" within the meaning of that provision.

17

monetary harm from continued exclusivity payments are injuries in fact.  *See TransUnion*, 594 U.S. at 425 (noting that monetary harm is an Article III injury in fact); *Bartch v. Barch*, 111 F.4th 1043, 1054 (10th Cir. 2024) (explaining that breach of contract is an Article III injury in fact).  However, the Governor argues that the Tribe lacks Article III standing because he does not have any relevant enforcement authority, and thus, those injuries were neither caused by him, nor are they redressable by the declaratory relief requested.[9]

We hold that the Tribe has Article III standing to seek a declaratory judgment that it is excused from paying the exclusivity fees that Part 11.A requires.  We conclude that the causation element is satisfied because the Tribe's injuries are fairly traceable to the challenged actions of the Governor—namely, signing into law bills that allegedly infringe

---

[9] We note that, although the Governor's objection to the Tribe's Article III standing could also apply to the Tribe's ability to avail itself of the *Ex parte Young* exception to the State's Eleventh Amendment immunity, *see, e.g.*, *Comanche Nation*, 174 F.4th at 731 ("*Ex Parte Young* also requires that the plaintiff sue an official charged with enforcing the challenged provision or engaging in challenged conduct."); *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014) ("Whether the Defendants have enforcement authority is related to whether, under *Ex parte Young*, they are proper state officials for suit." (quoting *Cressman v. Thompson*, 719 F.3d 1139, 1146 n.8 (10th Cir.2013))), the Governor has not raised Eleventh Amendment immunity with respect to this claim and in fact invoked the district court's jurisdiction to adjudicate, with respect to his counterclaim, the issue of whether the Tribe is obligated to pay the disputed exclusivity fees, *see U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 942 (10th Cir. 2008) (explaining that Eleventh Amendment immunity is waivable, and that a court need not raise it *sua sponte*); *see also Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998) ("Unless the State raises [Eleventh Amendment immunity], a court can ignore it.").  Therefore, we do not examine this immunity theory further.

on the Tribe's exclusivity, which Part 11.A protects.[10]  And we determine that a declaratory judgment against the Governor that would excuse the Tribe from paying the exclusivity fees that Part 11.A requires could redress the Tribe's injuries—even though the Governor lacks relevant enforcement authority over the Compact—because such declaratory relief would have preclusive effect against those State officials who do have relevant enforcement authority over the Compact.

1

The Tribe's alleged injuries were caused by the Governor in the Article III sense because they are fairly traceable to his challenged actions.  "The causation prong of Article III standing requires that the injury be 'fairly traceable to the challenged action of the defendant.'"  *Petrella v. Brownback*, 697 F.3d 1285, 1293 (10th Cir. 2012) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Here, the Tribe's alleged injuries are a breach of contract and associated monetary harms.  *See supra* II.B.  And the challenged action of the Governor is allegedly violating Part 11.A of the Compact by signing into law H.B. 1836 (expanded racetrack gaming hours) and H.B. 3538 (online lottery),[11] which legislation allegedly "permit[s] the operation of additional forms of

---

[10]    Of course, at this juncture, we express no view on the merits.  *See Tandy v. City of Wichita*, 380 F.3d 1277, 1283 n.10 (10th Cir. 2004) ("The threshold standing inquiry in no way depends on the merits of a plaintiff's contention that the challenged conduct is illegal." (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990))).

[11]    We note that the Tribe does not argue that its alleged injury stemming from the approval of S.Q. 792 (liquor-store lottery-ticket sales) is fairly traceable to the Governor.  *Cf.* SENATE JOURNAL, S. 55, 2d Sess., at 1122–1123 (Okla. 2016) (indicating that Senate Joint Resolution 68, which proposed placement of legislative referendum "S.Q. 792" on ballot, passed without gubernatorial input); OKLA. CONST. art. V, § 3

gaming and . . . additional electronic gaming." Aplt.'s App., Vol. II, ¶ 203, at 282–83.

Those injuries—breach of contract and associated monetary harms—are fairly traceable

to that challenged action of the Governor—enacting legislation in alleged violation of the

Compact—irrespective of whether the Governor has the authority to enforce the

Compact. *Cf. Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 385

(2024) ("[T]o establish causation, the plaintiff must show a predictable chain of events

leading from the government action to the asserted injury[] . . . ."); *Nat'l Ass'n for Gun

Rts. v. Polis*, 173 F.4th 1317, 1328 (10th Cir. 2026) ("To fulfill the causation element of

standing, a plaintiff must show 'a substantial likelihood that the defendant's conduct

caused plaintiff's injury in fact.'" (quoting *Santa Fe All. for Pub. Health & Safety v. City

of Santa Fe, N.M.*, 993 F.3d 802, 814 (10th Cir. 2021))). Accordingly, causation is

satisfied.

---

("The veto power of the Governor shall not extend to measures voted on by the people.").
It instead points to the Governor's role in passing S.B. 383, which the Tribe maintains
was enacted before S.Q. 792, but was only rendered effective upon S.Q. 792's approval.
*See* Aplt.'s Reply Br. at 24 n.8 ("S.Q. 792 was a statewide referendum amending the
Oklahoma Constitution and permitting S.B. 383 to go into effect, allowing electronic
lottery gaming machines to be placed in, *inter alia*, liquor stores."). But the passage of
S.B. 383 is not an action the Tribe has ever challenged in this litigation. *Cf. Petrella*, 697
F.3d at 1293 ("The causation prong of Article III standing requires that the injury be
'fairly traceable to the *challenged* action of the defendant.'" (emphasis added) (quoting
*Lujan*, 504 U.S. at 560)). We therefore conclude that the Tribe lacks Article III standing
to pursue its theory of breach based on the approval of S.Q. 792. *See, e.g., Raley v.
Hyundai Motor Co.*, 642 F.3d 1271, 1275 (10th Cir. 2011) ("Where an appellant fails to
lead, we have no duty to follow. It is the appellant's burden, not ours, to conjure up
possible theories to invoke our legal authority to hear her appeal.").

**2**

A declaratory judgment against the Governor that would excuse the Tribe from paying the exclusivity fees that Part 11.A requires could redress the Tribe's injuries—even though the Governor lacks relevant enforcement authority over the Compact—because such relief would have preclusive effect against those State officials who do have relevant enforcement authority over the Compact.

**a**

Generally speaking, the ability of a declaratory judgment to redress a plaintiff's injuries, in an Article III sense, is attributable to its preclusive effect. At first blush, a declaratory judgment may bear a striking resemblance to the forbidden advisory opinion. *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1111 n.12 (10th Cir. 2010) ("[D]eclaratory judgment actions often require courts to face the difficult task of distinguishing 'between actual controversies and attempts to obtain advisory opinions on the basis of hypothetical controversies.'" (quoting *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 458 (6th Cir. 2004))); *see also United States v. Muhtorov*, 20 F.4th 558, 607 (10th Cir. 2021) (noting that "[o]ne limitation on the judicial power is the prohibition of advisory opinions"). Upon closer examination, however, a declaratory judgment is distinct from a purely advisory opinion in a significant way that bears on redressability—specifically, its issue-preclusive effect.

"[R]edressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Haaland v. Brackeen*, 599 U.S. 255, 294

21

(2023) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in judgment)); *see also* William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 HARV. L. REV. 153, 177–83 (2023) (discussing *Haaland*'s "renewed attention to remedies" in Article III standing doctrine).  Unlike a purely advisory opinion, which relies exclusively on the "power" of persuasion, the remedial power of a declaratory judgment lies in its issue-preclusive effect in a later coercive action.  *See Haaland*, 599 U.S. at 293 ("[T]he point of a declaratory judgment 'is to establish a binding adjudication that enables the parties to enjoy the benefit of reliance and repose secured by res judicata.'" (quoting 18A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 4446 (3d ed. Supp. 2022)); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 33, cmt. e (A.L.I. 1982) (noting that "a declaratory judgment has binding effect with respect to the matters declared").

This theory of redressability is operative whether the redress is attributable to the preclusive effect against the defendant—or even against a nonparty.  In the mine-run of cases, a declaratory judgment is capable of redressing the plaintiff's injuries because of its preclusive effect against the defendant.  *See Jordan v. Sosa*, 654 F.3d 1012, 1025–26 (10th Cir. 2011) (collecting supportive authorities).  However, a declaratory judgment is also capable of redressing a plaintiff's injuries based on its preclusive effect against *nonparties*.  *See Wells v. Johnson*, 150 F.4th 289, 304 (4th Cir. 2025) (recognizing redressability based on nonparty preclusion, but ultimately finding under the circumstances before it no such preclusion); *cf. Haaland*, 599 U.S. at 292–93 (finding declaratory judgment against federal officials incapable of redressing plaintiffs' injuries

22

because state officials with enforcement authority were "nonparties who would *not be bound* by the judgment," and "[w]ithout preclusive effect, a declaratory judgment is little more than an advisory opinion" (emphasis added)).

Critically, in both instances—that is, as to a defendant or a nonparty who the judgment binds—the judgment affords the declaratory plaintiff reliance and repose by its issue-preclusive effect in a later coercive action. *See Haaland*, 599 U.S. at 294 ("[R]edressability requires that the court be able to afford relief *through the exercise of its power . . . .*" (quoting *Franklin*, 505 U.S. at 825 (Scalia, J., concurring in part and concurring in judgment)); *id.* at 293 ("[T]he point of a declaratory judgment 'is to establish a binding adjudication that enables the parties to enjoy the benefit of reliance and repose secured by res judicata.'" (quoting 18A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 4446 (3d ed. Supp. 2022)).

**b**

A declaratory judgment that the Tribe is excused from making the exclusivity payments required by Part 11.A of the Compact is *not* likely to redress the Tribe's injuries based on its preclusive effect against *the Governor*, because the Governor lacks relevant enforcement authority over the Compact.

The Governor's authority is limited to that "conferred upon the Chief Executive by the [Oklahoma] Constitution" or "specifically granted by the Legislature." *Ritter v. State*, 520 P.3d 370, 379 (Okla. 2022). Neither source empowers the Governor to halt the collection of the exclusivity fees.

Beginning with the Oklahoma Constitution, the Governor does not have general authority to conduct business with Tribes. *Stitt v. Treat ("Treat II")*, 546 P.3d 882, 891 (Okla. 2024) ("Though Article VI, § 8 of the Oklahoma Constitution confers [on] the Governor authority to conduct business of the State, it does not specifically state the authority extends to business with Tribes—rather, it explicitly states the Governor's authority to conduct business is limited to business 'with other states and with the United States.'" (quoting OKLA. CONST. art. VI, § 8)).  And enforcement of the Compact does not fall within any of the Governor's enumerated powers.

Turning to authority specifically granted by the Oklahoma legislature, no statute empowers the Governor to enforce the provisions of the Compact.  In Oklahoma, the legislature decides the extent, if any, of the Governor's authority over agencies the legislature creates.  *Wentz v. Thomas*, 15 P.2d 65, 69 (Okla. 1932).  And under the Compact, the State's enforcement authority is vested in various legislature-created entities.  But the legislature had not granted the Governor specific enforcement authority over the Compact through those entities.  *Compare* Aplt.'s App., Vol. I, at 136 (contemplating role in Compact oversight for the Oklahoma State Bureau of Investigation), *and* Aplt.'s App., Vol. I, at 136 ("[T]he state agency that has the authority to carry out the state's oversight responsibilities under this Compact[] [] shall be the Office of State Finance or its successor agency."), *and* 2012 Okla. Sess. Laws Ch. 304 (consolidating "the Office of State Finance into the Office of Management and Enterprise Services [('OMES')]"), *with* Okla. Stat. tit. 74, §§ 150.1–152.7 (vesting OSBI authority in OSBI Commission headed by a director), *and* OKLA. STAT. tit. 62, §§ 34.5–34.6 (not

24

including a specific grant of enforcement authority over the Compact to the Governor through the OMES).

Thus, the Governor lacks enforcement authority over the Compact. Consequently, a declaration that the Tribe is excused from making the exclusivity payments required by Part 11.A of the Compact would be of no utility to the Tribe in a later coercive action against the Governor. Therefore, such relief is not likely to redress the Tribe's injuries based on its preclusive effect against the Governor.

**c**

A declaratory judgment that the Tribe is excused from making the exclusivity payments required by Part 11.A of the Compact *is* likely to redress the Tribe's injuries, however, based on its preclusive effect against nonparty State officials who actually do have authority to enforce Part 11.A.

"The preclusive effect of a federal-court judgment is determined by federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008); *accord In re Corey*, 583 F.3d 1249, 1251 (10th Cir. 2009). The elements of issue preclusion are:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, *or in privity with a party*, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir. 2000) (emphasis added).

Initially, we assume that the first two elements are satisfied.  This is so because, for purposes of our jurisdictional inquiry, the very question is what would be the effect of a merits judgment in the Tribe's favor in subsequent litigation presenting the same issue.

As for the third element, the State official who would enforce Part 11.A against the Tribe is in privity with the defendant here—that is, the Governor.  Under Part 11.A, "payments of [the exclusivity] fees shall be made to the Treasurer of the State of Oklahoma."  Aplt.'s App., Vol. I, at 151.  "There is privity between officers of the same government" if the state official in the first case (here, the Governor) "had authority to represent [the state's] interests in a final adjudication of the issue in controversy." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402 (1940); *accord United States v. Rogers*, 960 F.2d 1501, 1509 (10th Cir. 1992); *cf. First Mortg. Corp. v. United States*, 961 F.3d 1331, 1341–42 (Fed. Cir. 2020) ("Privity asks 'whether or not' the [the first agency] 'had the authority to represent the [state's] interests in a final adjudication of the issue in controversy'—not whether the [the first agency] has the authority to represent [the second agency] in court." (alterations adopted) (quoting *Sunshine Anthracite*, 310 U.S. at 403)).

The Oklahoma Supreme Court recently confirmed the Governor's broad constitutional and statutory authority to represent the State in court, including in litigation over tribal-State gaming compacts.  In *Cherokee Nation v. United States Department of the Interior*, several tribes sued the Governor in federal court, challenging the validity of other tribes' gaming compacts with the State.  564 P.3d 58, 64–65 (Okla. 2025).  Over the Governor's objection, the Attorney General attempted to intervene and assume the

26

Governor's and State's defense, arguing that the State was the real party in interest and that the Attorney General was the State's chief law officer. *Id.* at 65–66. More specifically, the Attorney General argued that he was statutorily authorized to take "complete dominion over litigation involving the State, and although the Governor is authorized to employ counsel, the Attorney General has the power to take and assume control in any case involving the State's interests." *Id.* at 69.

Answering a question that the federal court certified to it, the Oklahoma Supreme Court held that the Governor could select and direct his own counsel in the litigation because he has general constitutional and statutory authority to represent the State, even though the Attorney General also has statutory authority to represent the State in the case. *See id.* at 74 ("[W]e conclude that the Governor, in defending the claims asserted against the State, is entitled to be represented by an attorney whose views are consonant with his own . . . ."); *id.* at 70 ("To be clear, the broad authority of the Attorney General to represent the State is not nullified by the statutes which permit the Governor to select his own counsel. Rather, the Governor's specific authority *runs concurrently* with the general authority of the Attorney General." (emphasis added)). Notably, the court concluded that "[t]he Governor, in his official capacity, is answerable on behalf of the State in the underlying matter [challenging the validity of the compacts], and . . . that he possesses statutory and constitutional authority to represent the interests of the State of Oklahoma in that proceeding." *Id.* at 73.

Not only does *Cherokee Nation* describe broad authority by the Governor to represent the State in litigation generally; it also specifically shows that the Governor has

27

authority to represent the State in litigation regarding its tribal gaming compacts, even where other state officials are statutorily authorized to represent the State (e.g., the Attorney General). In short, *Cherokee Nation* leaves us with no doubt that the Governor has at least concurrent authority to represent the State in litigation over the State's compliance with, and the Tribe's obligations under, the Compact. Other state officials, including those directly responsible for enforcing the Compact against the Tribe—notably, the State Treasurer—are therefore in privity with the Governor with respect to the declaratory judgment claim regarding the exclusivity fees because of the Governor's broad authority to represent the State in litigation and, in particular, in litigation regarding its tribal gaming compacts. *See Sunshine Anthracite*, 310 U.S. at 402.

Lastly, the fourth element is satisfied because the Attorney General's Office assumed control over this litigation, and it would be the same entity that would seek to enforce Part 11.A on the State Treasurer's behalf in any litigation, *see* OKLA. STAT. tit. 74, § 18b(A)(6) (tasking Attorney General with prosecution of breach-of-contract actions at the request of State Treasurer). *See* RESTATEMENT (SECOND) OF JUDGMENTS § 39 ("A person who is not a party to an action but who controls or substantially participates in the control of the presentation on behalf of a party is bound by the determination of issues decided as though he were a party." (bold-face font omitted)). As a general rule, a nonparty "has not had a 'full and fair opportunity to litigate' the claims and issues settled in [a] suit." *Taylor*, 553 U.S. at 892 (quoting *Richards v. Jefferson Cnty.*, 517 U.S. 793, 798 (1996)). However, this "rule against nonparty preclusion is subject to exceptions." *Id.* at 893. As relevant here, "a nonparty is bound by a judgment if [it] 'assume[d]

28

control' over the litigation in which that judgment was rendered." *Id.* at 895 (quoting

*Montana v. United States,* 440 U.S. 147, 154 (1979)); *accord* RESTATEMENT (SECOND)

OF JUDGMENTS § 39.  It is plain to us that the Attorney General's Office assumed control

of the Governor's defense against the Tribe's claim for declaratory relief.

At the outset of the litigation, the Governor's counsel—two private attorneys and

one attorney from the Office of the Governor—answered the Tribe's first amended

intervenor complaint "in his official capacity as Governor of the State of Oklahoma . . .

and *ex rel.* State of Oklahoma . . . as the real party in interest."  Aplt.'s App., Vol. II, at

290 (Ans. & Counterclaims, filed Mar. 31, 2020); *see also id.* at 348 (signing pleading as

"[a]ttorneys for J. Kevin Stitt, as Governor of the State of Oklahoma and *ex rel.* the State

of Oklahoma" (small capitals removed)).  They averred: "Oklahoma constitutes the real

party in interest.  As the real party in interest, the State hereby ratifies and/or joins the

above-captioned civil action pursuant to Rule 17(a)(3), Fed. R. Civ. P., including the

assertion of these counterclaims." *Id.* at 332.

Importantly, after the district court entered judgment resolving the renewal portion

of the litigation, and there only remained (as relevant here) the Tribe's claims for

declaratory relief with respect to Parts 11.A and 11.E—i.e., the portions of the action at

issue here—the Governor's counsel withdrew from the case, and counsel from the Office

of the Attorney General of the State of Oklahoma appeared in the case.  In their entries of

appearance, they purported to enter appearances on behalf of the State pursuant to

sections 18 and 18b of title 74 of the Oklahoma Statutes, stating that the "Oklahoma

Attorney General . . . hereby takes and assumes control of the State's interest in defense

of this case." *E.g.*, Entry of Appearance, Dist. Ct. Dkt. 171. Section 18 designates the Attorney General as "the chief law officer *of the state*." OKLA. STAT. tit. 74, § 18 (emphasis added). And section 18b specifies that it is the duty of the Attorney General "[t]o appear for the state and prosecute and defend all actions and proceedings in any of the federal courts in which *the state* is interested as a party." *Id.* § 18b(A)(2) (emphasis added).

Finally, after the district court granted summary judgment in the Governor's favor in the litigation at issue here, the three counsel for the State withdrew from the case, and three new counsel—*also* from the Attorney General's Office—appeared in the case. Those three new counsel have handled this appeal.

Therefore, it is clear that the Attorney General's Office assumed control of this litigation, from at least the time of the relevant district court proceedings—*viz.*, those proceedings relating to the Tribe's exclusivity-fee-related claims implicating Parts 11.A and 11.E—and continue to control it through the time of this appeal. Upon behalf of the State, the Attorney General consequently has had a full and fair opportunity to litigate the merits of the Tribe's claim for declaratory relief as to Part 11.A, and this circumstance would give any declaratory judgment concerning Part 11.A of the Compact preclusive effect, even though the Governor (not the Office of the Attorney General or anyone it represents) is the named defendant here on the State's behalf. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 39, cmt. a ("A person who assumes control of litigation on behalf on [sic] another has the opportunity to present proofs and argument on the issues

30

litigated. Given this opportunity, he has had his day in court and should be concluded by the result.").

Specifically, the state officer responsible for enforcing Part 11.A, the State Treasurer, is in privity with the Governor, as we have discussed, and that officer would be represented in any future exclusivity-fee-related lawsuit of the Tribe by the same Office of the Attorney General that has had a full and fair opportunity to litigate on the State's behalf the Tribe's declaratory judgment claim regarding such fees here. Accordingly, we conclude that a declaratory judgment against the Governor as to the Tribe's exclusivity-fees claim under Part 11.A would have preclusive effect against the State Treasurer—an Oklahoma official authorized to collect such fees by Part 11.A.

Therefore, we determine that the Tribe has Article III standing to sue the Governor. In particular, this is because its claim for a declaratory judgment that it is excused from making the exclusivity payments required by Part 11.A would likely redress the Tribe's alleged injuries.

*  *  *

In summary, there is federal subject-matter jurisdiction of just one of the Tribe's two claims for relief. Specifically, the Tribe's claim for a declaratory judgment that it is excused from making the exclusivity payments required by Part 11.A of the Compact is justiciable under Article III (i.e., the Tribe has standing). That is because such a judgment likely would redress the Tribe's injuries by its issue-preclusive effect against the nonparty State Treasurer, who has authority to enforce Part 11.A. In contrast, the

31

Tribe's claim for a declaratory judgment that it is entitled to liquidated damages under Part 11.E of the Compact is barred by the State's Eleventh Amendment immunity.

We turn now to the merits of the one claim regarding which we have subject-matter jurisdiction—the declaratory exclusivity-fees claim.

## III

The Tribe challenges the district court's adverse summary judgment on its claim for a declaratory judgment that the Tribe is excused from making the exclusivity payments that Part 11.A of the Compact requires. This challenge turns on the following interpretive question: Whether the State violated Part 11.A of the Compact by authorizing second-chance and promotional lotteries through the passage of H.B. 3538.[12]  We hold

---

[12]    The Tribe also argues that the State violated Part 11.A of the Compact by removing the prohibition on liquor stores selling lottery tickets through S.Q. 792 and expanding the hours during which racetracks are permitted to operate gaming through the passage of H.B. 1836. Recall, however, that the Tribe lacks Article III standing to sue the Governor for the legislature's proposal, and the people's approval, of S.Q. 792. *See supra* note 11. And we decline to reach the Tribe's H.B. 1836 theory of breach, because it has been waived. Specifically, under Part 11.A, the Tribe's exclusivity is violated by a change in laws permitting either "the operation of any additional form of gaming by an[] [] organization licensee," or "any additional electronic or machine gaming." Aplt.'s App., Vol. I, at 150. The district court concluded that H.B. 1836's expansion of the hours during which racetracks are permitted to operate gaming did not violate Part 11.A because only the first alternative applies to organization licensees (that is, *not* the alternative concerning the adding of electronic or machine gaming); racetracks are organization licensees; and permitting expanded hours is not permitting additional forms of gaming. On appeal, the Tribe has not engaged with any part of that rationale. The issue is therefore waived. *See Nixon*, 784 F.3d at 1366 ("The first task of an appellant is to explain to us why the district court's decision was wrong."); *Walker*, 918 F.3d at 1151 ("Ordinarily, a party's failure to address an issue in its opening brief results in that issue being deemed waived. And, ordinarily, we will decline to reach the merits of waived issues.").

that Part 11.A of the Compact is ambiguous and remand for resolution of that ambiguity, including with the aid of extrinsic evidence if appropriate and helpful.

### A

"We review the district court's summary judgment decision de novo, applying the same standards as the district court." *Klein v. Roe*, 76 F.4th 1020, 1028 (10th Cir. 2023) (quoting *Punt v. Kelly Servs.*, 862 F.3d 1040, 1046 (10th Cir. 2017)). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 994 F.3d 1166, 1171 (10th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)). "A 'material fact' is one which could have an impact on the outcome of the lawsuit, while a 'genuine issue' of such a material fact exists if a rational jury could find in favor of the non-moving party based on the evidence presented." *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1216 (10th Cir. 2000).

The parties' cross-motions for summary judgment turned on the meaning of Part 11.A of the Compact. To interpret a tribal-State compact, "we look to the federal common law." *Citizen Potawatomi*, 881 F.3d at 1239. "[W]e begin by examining the express terms of the Compact as the best indication of the intent of the parties." *Tarrant Reg'l Water Dist. v. Hermann*, 569 U.S. 614, 628 (2013). We "will construe the Compact to give meaning to every word or phrase." *Citizen Potawatomi*, 881 F.3d at 1239. If those terms are unambiguous, we confine ourselves to the Compact's four corners, without consulting extrinsic evidence. *See id.* If, however, those terms are ambiguous, we "can consult extrinsic evidence to determine the parties' intentions."

*CNH Indus. N.V. v. Reese*, 583 U.S. 133, 139 (2018).  A term is ambiguous if, "after applying established rules of interpretation, [it] remains reasonably susceptible to at least two reasonable but conflicting meanings."  *Id.* (alteration in original) (quoting 11 Samuel Williston & Richard A. Lord, A TREATISE ON THE LAW OF CONTRACTS § 30:4, pp. 53–54 (4th ed. 2012)).

**B**

Under Part 11.A of the Compact, the Tribe's "substantial exclusivity" is violated if the State changes its laws to permit either "the operation of any additional form of gaming by any such organization licensee," or "any additional electronic or machine gaming within Oklahoma."  Aplt.'s App., Vol. I, at 150.  The Tribe does not allege, nor do we believe, that H.B. 3538 (online lottery) impacted organization licensees.  Thus, whether its enactment violated Part 11.A turns on the meaning of "additional electronic or machine gaming."  We conclude that the phrase is ambiguous because it is reasonably susceptible to the conflicting, plausible meanings advanced by the district court and each of the parties.  We discuss each interpretation in turn.

**1**

As the district court concluded, "additional electronic or machine gaming" could be coterminous with the term "covered game" as it is defined in the Compact.  Two contextual clues support this reading.

First, the preceding sentence states that the Compact "provides tribes with substantial exclusivity and, consistent with the goals of IGRA, special opportunities for tribal economic opportunity through gaming within the external boundaries of Oklahoma

in respect to the covered games." Aplt.'s App., Vol. I, at 150. In light of this explicit reference to "covered games," it is plausible that Part 11.A confers substantial exclusivity only as to the games covered by the Compact.

Second, "covered game" is defined to include, among others, "an *electronic* bonanza-style bingo game, an *electronic* amusement game, [and] an *electronic* instant bingo game." *Id.* at 134 (emphasis added). It is plausible then that "additional *electronic* or machine gaming," *id.* at 150 (emphasis added), refers to those covered games.

## 2

Alternatively, as the Tribe argues, "additional electronic or machine gaming" could be broader than the term "covered game," and instead carry its plain and ordinary meaning of "any gaming conducted in an electronic environment that was not authorized by the State at the time the Compact went into effect." Aplt.'s Reply Br. at 11. This reading finds support in Part 11.E of the Compact. In pertinent part, it declares that

> In consideration for the covenants and agreements contained herein, the state agrees that it will not, during the term of this Compact, permit the nontribal operation of any machines or devices to play *covered games or electronic or mechanical gaming devices* otherwise presently prohibited by law within the state in excess of the number and outside of the designated locations authorized by the State-Tribal Gaming Act.

Aplt.'s App., Vol. I, at 151 (emphasis added). The use of the phrase "electronic or mechanical gaming devices" alongside the term "covered games," separated by an "or," may suggest that these two terms are distinct, or at least not coterminous. *See, e.g.*, *McDaniel v Navient Sols., LLC (In re McDaniel)*, 973 F.3d 1083, 1095 (10th Cir. 2020) (noting that "Congress, moreover, expressly contrasted those terms . . . by connecting

35

them with a disjunctive 'or,' indicating that they refer to different things and have

'separate meanings'" (quoting *Loughrin v. United States*, 573 U.S. 351, 357 (2014))).

**3**

The Governor plausibly argues, however, that the Tribe's reading of "additional

electronic or machine gaming" could cause it to swallow the other way of violating

substantial exclusivity ("the operation of any additional form of gaming by any such

organization licensee"), and a better reading might be that "additional electronic or

machine gaming" of Part 11.A of the Compact is coterminous with the term "electronic

gaming" as defined in the STGA.

Taking the components of the Governor's argument in turn, recall that the Tribe's

"substantial exclusivity" is violated if the State changes its laws to permit *either* "the

operation of any additional form of gaming by any such organization licensee," *or* "any

additional electronic or machine gaming within Oklahoma." Aplt.'s App., Vol. I, at 150.

If "any additional electronic or machine gaming" means any increase in gaming

occurring in an electronic format, then the arguably narrower prohibition against "the

operation of any additional form of gaming by any such organization licensee" might in

many instances be rendered superfluous.

Further, reasons the Governor, "additional electronic or machine gaming" could be

coterminous with the term "electronic gaming" as defined in the STGA. It defines

"electronic gaming" as "the electronic amusement game, the electronic bonanza-style

bingo game and the electronic instant bingo game described in this act, which are

included in the authorized gaming available to be offered by organization licensees." OKLA. STAT. tit. 3A, § 269(8).

In considering this reasoning, however, one should be mindful that the STGA's definitions do not automatically apply to the Compact. *Compare id.* § 269 (limiting STGA's definitions to "Sections 2 through 20 of this act"), *with* 2004 Okla. Sess. Laws Ch. 316 (codifying model compact at *section 22* of STGA). Nevertheless, in light of the Compact's incorporation of other STGA terms and definitions, it is at least plausible that the drafters of the Compact also intended to incorporate the STGA's definition of "electronic gaming."

\*\*\*

In sum, as the foregoing demonstrates, "additional electronic or machine gaming" "remains reasonably susceptible to at least two reasonable but conflicting meanings." *CNH Indus.*, 583 U.S. at 139 (quoting Williston & Lord, *supra*, at 53–54). We therefore hold that Part 11.A of the Compact is ambiguous.

### C

Having concluded that Part 11.A of the Compact is ambiguous, we remand for the district court to resolve the ambiguity in the first instance with the aid, as needed, of extrinsic evidence. Remand is appropriate where, as here, the district court has not had occasion to look outside of the four corners of the document because it erroneously concluded that the document was *un*ambiguous. *See Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 431 (10th Cir. 2006) (concluding that although "[w]e have some discretion to decide to determine ourselves what [the correct interpretation is], . . . the better practice is to

37

remand to the district court to permit the parties to present the applicable law and perhaps to develop further facts that may be relevant under that law"); *see also Belvill Co., Inc. v. Sprint/United Mgmt. Co.*, 154 F. App'x 49, 52 (10th Cir. 2005) ("The contract is ambiguous on this score.  That ambiguity must be resolved by further proceedings below.");[13] *cf. Lyn M. v. Premera Blue Cross*, 966 F.3d 1061, 1070 (10th Cir. 2020) ("When the district court has not reached a required issue, we typically permit that court to tackle the issue in the first instance."); *Chegup v. Ute Indian Tribe of Uintah & Ouray Rsrv.*, 28 F.4th 1051, 1070 (10th Cir. 2022) ("[W]e should permit 'the district court . . . to pass judgment on the matter first because we are a court of review, not first view.'" (quoting *CGC Holding Co., LLC v. Hutchens*, 974 F.3d 1201, 1216 (10th Cir. 2020)).  On remand, the district court may "consult extrinsic evidence to determine the parties' intentions." *CNH Indus.*, 583 U.S. at 139.  We emphasize that we have not taken any definitive position on the correctness of the possible interpretations that we have outlined herein.

## IV

In sum, for the foregoing reasons, we **affirm** the district court's sovereign-immunity, jurisdictional dismissal of the Tribe's claim for a declaratory judgment that it is entitled to liquidated damages, and we **reverse** on the merits the district court's adverse summary judgment ruling on the Tribe's claim for a declaratory judgment that it is excused from paying the exclusivity fees that Part 11.A of the

---

[13]     We rely on this unpublished case only for its persuasive value.  *See United States v. Engles*, 779 F.3d 1161, 1162 n.1 (10th Cir. 2015).

Compact requires and **remand** to the district court with directions to vacate its judgment dismissing that claim and resolve Part 11.A's ambiguity and conduct all further necessary proceedings consistent with this order and judgment.

Entered for the Court

Jerome A. Holmes
Chief Judge